IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
CASE NO. 5:25-cv-368

| | | |
|---|---|---|
| JOHN KESSLER and CAROLYN KESSLER, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | **COMPLAINT** **(JURY TRIAL DEMANDED)** |
| CROSSCOUNTRY MORTGAGE, LLC, and RALEIGH REALTY INC. | ) ) | |
| Defendants. | ) ) ) | |

Now come Plaintiffs John Kessler and Carolyn Kessler ("Plaintiffs" or "the Kesslers") and file their Complaint against Defendants CrossCountry Mortgage, LLC ("CrossCountry"), and Raleigh Realty, Inc. ("Raleigh Realty" and, collectively with CrossCountry, "Defendants") alleging violations of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601 *et seq*.; violations of the North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA"), N.C.G.S. § 75-1.1 *et seq*.; and related claims for civil conspiracy. Plaintiffs make their allegations on information and belief except as to Plaintiffs' own actions, of which they have personal knowledge, and as otherwise noted below.

## I.    INTRODUCTION.

1.    This action arises out of, *inter alia*, Defendants' violations of RESPA, which prohibits "kickbacks" and other "unearned fees." *See generally* 12 U.S.C. § 2607.

2. RESPA was enacted to eliminate "kickbacks or referral fees that <u>tend to increase</u> <u>unnecessarily the costs of certain settlement services</u>." 12 U.S.C. § 2601(b)(2) (emphasis added). Its purpose is to provide consumers "with greater and more timely information on the nature and costs of the settlement process" so they may be "protected from unnecessarily high settlement charges caused by certain abusive practices." *Id*. § 2601(a).

3. *Settlement services* include "any service provided in connection with a real estate settlement," including those "rendered by a real estate agent[;] the origination of a federally related mortgage loan[;] the handling of processing, and closing or settlement[;]" closing costs on a home purchase; costs associated with the application, processing, underwriting, and funding involved in the origination of a mortgage; and costs of the interest paid on the mortgage by the homebuyer. 12 U.S.C. § 2602(3).[1] These services and costs are governed by RESPA.[2]

4. In pertinent part, RESPA expressly disallows the acceptance of "any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person." 12 U.S.C. § 2607(a).

---

[1] *See, e.g., Schmitz v. Aegis Mortg. Corp.*, 48 F.Supp.2d 877, 881 (D. Minn. 1999) ("Total compensation to a [mortgage] broker includes direct origination and other fees paid by the borrower, indirect fees, <u>including those that are derived from the interest rate paid by the borrower</u>, or a combination of some or all" (quoting RESPA Statement of Policy 1999–1 re: Lender Payments to Mortgage Brokers, 64 Fed. Reg. 10084 (Mar. 1, 1999)) (emphasis added)).

[2] In RESPA and colloquially, licensed real estate professionals are interchangeably called "agents" and "brokers." For clarity, this Complaint refers to licensed real estate professionals as "<u>agents</u>," and licensed mortgage professionals as "<u>brokers</u>."

5. Consequently, a settlement-service provider "who agrees to pay a monetary referral fee that is not tied in any respect to a charge paid by a particular consumer," like "a 'retainer' agreement pursuant to which the provider pays a monthly lump sum in exchange for the recipient's agreement to refer any business that comes his way," would violate RESPA § 2607(a). *Freeman v. Quicken Loans, Inc.*, 566 U.S. 624, 636 (2012).

6. Defendants systematically and unlawfully exchanged fees, kickbacks, and other things of value pursuant to an agreement between CrossCountry and Raleigh Realty, with respect to Raleigh Realty's referral of its homebuyer clients to CrossCountry for services related to real estate-settlement services involving federally related mortgage loans.

7. Specifically, CrossCountry, by and through agreements consummated by its Executive Vice President Charles Shackelford, made recurring improper payments (*i.e.*, "kickbacks" or "unearned fees" (*see* 12 U.S.C. § 2607)) to Raleigh Realty (and other realty companies) disguised as payments for legitimate services. These payments have a tendency to increase settlement costs to consumers, including Plaintiffs, unnecessarily.

8. As a result of Defendants' unlawful agreement and their resulting actions, Plaintiffs were unfairly and deceptively coerced into obtaining federally-related mortgage loans from CrossCountry, resulting in concrete injury by the payment of both excessive closing fees and interest rates in excess of what they would have been charged by CrossCountry's competitors in the market.

## II.    THE PARTIES.

**9.**    Plaintiffs John Kessler and Carolyn Kessler are a married couple who received and paid for residential realty services from Raleigh Realty for the purchase of real property located at 106 Sunset Bluffs Drive, Fuquay-Varina 27526, Wake County, North Carolina (the "Property"). They have been residents of North Carolina since December 2021, when they purchased the Property.

**10.**    Plaintiff John Kessler obtained a mortgage loan from CrossCountry for the purchase of the Property and granted a security interest in the Property to Cross Country via a deed of trust.

**11.**    Plaintiff Carolyn Kessler granted a security interest in Property to Cross Country via a deed of trust.

**12.**    Defendant CrossCountry Mortgage, LLC, is a Delaware limited-liability company with its principal office in Ohio, Ohio. CrossCountry provides mortgage-lending and -origination services to residential homebuyers across the United States. CrossCountry maintains a branch in Raleigh, North Carolina, led by branch manager Corey Walker and supervised by executive vice president Chuck Shackelford.

**13.**    Mr. Shackelford and Mr. Walker are both employees and agents of Defendant CrossCountry and were acting within the course and scope of their employment and agency at all times and with respect to all actions relevant to this action.

**14.**    Defendant Raleigh Realty Inc. (*f/k/a* Raleigh Realty, LLC) is a North Carolina corporation and real estate agency specializing in representing residential

homebuyers and sellers. Its principal office is located at 2474 Walnut Street, Unit No. 248, in Cary, North Carolina. Its owner and president is Ryan Fitzgerald.

15. As Defendant Raleigh Realty's owner and president, Mr. Fitzgerald is an agent of Raleigh Realty and was acting within the course and scope of his agency at all times and with respect to all actions relevant to this action.

## III.    JURISDICTION & VENUE.

16. The foregoing allegations are incorporated by reference and realleged herein.

17. ***Subject-Matter Jurisdiction.*** This Court has federal-question jurisdiction pursuant to 28 U.S.C. § 1331; and supplemental jurisdiction exists pursuant to 28 U.S.C. § 1367.

18. ***Personal Jurisdiction.*** This Court has personal jurisdiction over Defendants because both are registered to do business in North Carolina and conduct considerable business within North Carolina. Additionally, Plaintiffs are both natural persons and residents of Wake County, North Carolina and virtually all the alleged violations giving rise to this action occurred in North Carolina.

19. ***Venue.*** Venue is proper under 28 U.S.C. § 1391. Both Defendants conduct business in this District, and a substantial part of the events giving rise to the claims occurred in this District.

## IV.    FACTUAL ALLEGATIONS.

20. The foregoing allegations are incorporated by reference and realleged herein.

### Background on Charles Shackelford

21. Mr. Shackelford is an Executive Vice President of CrossCountry.

22. Mr. Shackelford has a team of people who work directly for him in seven branches across the country, including in at least two locations in North Carolina (Raleigh and Wilmington).

23. Mr. Shackelford has been sued individually on at least two separate occasions regarding alleged improprieties at previous banks in which he was a loan officer.

**Background on CrossCountry's Marketing Arrangements.**

24. Mortgage companies use at least two types of marketing arrangements with realty companies: (a) Marketing Services Agreements ("MSAs") and (b) Co-Marketing Agreements.

25. When an MSA is used by a mortgage company, it pays a realty company preset amounts in exchange for marketing services such as displaying the mortgage company's marketing materials on its website and at their physical locations.

26. An MSA is permissible under RESPA only if: (1) "it is structured and implemented consistently as an agreement for the performance of actual marketing services[;]" and (2) "the payments under the MSA are reasonably related to the value of the services performed." Consumer Financial Protection Bureau ("CFPB"), *FAQs – RESPA Section 8: Marketing Services Agreements*, (Oct. 7, 2020) (citing 12 U.S.C. § 2607(c)(2); 12 C.F.R. § 1024.14(g)(1)(iv), (g)(2)).[3]

27. An MSA, like any other agreement or contract, including the below-described Co-Marketing Agreements, is <u>not</u> permissible where the surrounding facts and

---

[3] *See* https://www.consumerfinance.gov/compliance/compliance-resources/mortgage-resources/real-estate-settlement-procedures-act/real-estate-settlement-procedures-act-faqs/#respa-section-8-marketing-services-agreements-msas.

circumstances demonstrate that "the MSA as structured, or the parties' implementation of the MSA—in form or substance[,] including as a matter of course of conduct—involves" any action that "violates the prohibitions [of] RESPA [§§ 2607(a) or (b)]." *Id*. Specifically, agreements involving "payments for referrals are prohibited under [RESPA]." *Id*.

28. Co-Marketing Agreements involve CrossCountry and the realty company jointly sharing the expenses of a joint marketing effort. For example, CrossCountry and the realty company can jointly elect to advertise on websites like Facebook, Zillow, or realtor.com.

29. A Co-Marketing Agreement functions similarly to a MSA and is subject to the same provisions of RESPA, particularly those regarding payments conditioned on referrals. *See Co-Marketing Tips for Following RESPA Rules*, Nat'l Ass'n of Realtors Mag. (Nov. 1, 2018).[4]

30. Settlement service providers can exchange payments "for goods, facilities, or services provided as long as the price is reasonable and not based on referral business," and co-marketing parties must continue to "monitor whether the [agreed-upon] services are actually being performed[;]" in other words, both parties "must [be] able to verify that the work is actually being done" pursuant to their agreement and in line with RESPA. *Id*.

---

[4] *See* https://www.nar.realtor/magazine/live/co-marketing-tips-for-following-respa-rules.

31. CrossCountry and the realty agency enter into a co-marketing arrangement that, at least on the face of a written contract appears to be lawful. In practice, however, and as more fully explained below, the unlawful pay-to-play requirement is common among co-marketing arrangements in which Mr. Shackelford is involved. CrossCountry and the realty agency agree in advance on an amount of payment in return for exclusive referrals to CrossCountry based upon the number of expected referrals. The pay-to-play relationship is established *before* any written contract is executed. The co-marketing arrangement is simply a cover for the pre-existing unlawful agreement.

32. CrossCountry maintained policies for approval of vendors with whom it could use for co-marketing, and it is extremely challenging for new vendors to be approved if they are not already on CrossCountry's approved-vendor list.

33. However, CrossCountry was willing to ignore these policies when necessary; particularly when it involved Mr. Shackelford's team.

34. For example, and more thoroughly alleged below, between February and March 2021, Defendants entered into an unlawful Co-Marketing Agreement under which CrossCountry would pay Raleigh Realty for referrals of Raleigh Realty's homebuyer clients seeking a mortgage, resulting in a "pay-to-play" scheme operating in direct violation of RESPA. *See* 12 U.S.C. § 2601(b).

## Defendants' Unlawful Agreement

35. In mid-February 2021, Mr. Fitzgerald and various CrossCountry employees—including Mr. Walker and Mr. Shackelford—began to discuss the terms and expectations for an agreement between the two entities.

36. Ultimately it was agreed that CrossCountry would pay $15,000.00 per month to Raleigh Realty. From the beginning it was understood that the Defendants intended to engage in a "pay-to-play" scheme based on referrals with Raleigh Realty—an arrangement far outside the boundaries of RESPA's requirements and CrossCountry's policy. Mr. Shackelford told Mr. Fitzgerald around this time that he expected an average kickback of about $500 for each referral.

37. Mr. Fitzgerald understood that Raleigh Realty clients would comply with its directions to use Cross Country as their mortgage provider.

38. Before initiating a co-marketing agreement with Raleigh Realty, Mr. Shackelford specifically intended to expedite CrossCountry's process of vetting and approving it, also demonstrating Defendants' intent to finalize an agreement that circumvents RESPA and company policy.

39. In early 2021, Defendants agreed that CrossCountry would pay a substantial portion of Raleigh Realty's marketing costs in return for Raleigh Realty's exclusive referral of its homebuyer clients to Cross Country for mortgage origination.

40. Specifically, CrossCountry confirmed that the agreed-upon payment of $15,000 would be used to cover at least one-half of Raleigh Realty's monthly payments to Page One Power LLC ("Page One Power"), a digital marketing company

specializing in search engine optimization. *See* Page One Power Contract, attached as <u>Exhibit 1</u>.

41.   Mr. Shackelford, as he did in other circumstances, expedited or circumvented the process by which co-marketing vendors were generally approved by CrossCountry's marketing department. For this particular deal, Mr. Shackelford took this proposal straight to top CrossCountry executives. CrossCountry marketing managers who customarily review co-marketing agreements warned the company' executives that the expedited procedure circumvented company policy and violated RESPA. (*Id.*).

42.   Nonetheless, Defendants' agreement was executed on April 12, 2021; and was incorporated into the contract[5] with Page One Power via an "Addendum for Vendor Investment Inclusions." (*See* <u>Ex. 1</u>).

43.   Per the agreement, each Defendant (represented by Mr. Fitzgerald and Mr. Shackelford, respectively) was to pay $15,000 for Page One Power's services to Raleigh Realty. (*Id.*).

44.   In return for CrossCountry's $15,000 contribution, Raleigh Realty was to ostensibly provide various "web marketing services"; however, the reality is that the remuneration was agreed upon in advance and the "marketing services" were simply window-dressing provided for plausible deniability.

---

[5] Raleigh Realty originally contracted with Page One Power in January 2021. (*See* <u>Ex. 1</u>).

45. Thereafter, CrossCountry began making monthly payments under Defendants' agreement, but <u>not</u> as reimbursements sent to Raleigh Realty—instead, CrossCountry received and paid each monthly invoice for $15,000 directly from and to Page One Power.

46. Upon information and belief, Defendants' agreement operated without significant monitoring or oversight—including the monthly documentation proving both parties' adherence to the agreement—from either Defendant for more than one year, also in knowing violation of CrossCountry's co-marketing guidelines.

47. Pursuant to Defendants' agreement, Mr. Fitzgerald continuously instructed and required Raleigh Realty agents to exclusively use CrossCountry to provide the mortgage financing that their clients would inevitably need.

48. Upon information and belief, Defendant Raleigh Realty employs approximately thirty agents who represent and guide homebuyers through the real estate market, evaluating their options, negotiating purchases, and facilitating the closing on the sale of a property.

49. As owner and president of Raleigh Realty, Mr. Fitzgerald possesses and exercises significant control over Raleigh Realty agents' representation of homebuyers. Thus, in furtherance of Defendants' agreement, Raleigh Realty strictly enforced a requirement upon its agents to <u>exclusively</u> refer, compel, and otherwise direct all buyers to CrossCountry for mortgage lending services.

50. Specifically, Mr. Fitzgerald continually told all Raleigh Realty agents that CrossCountry's Corey Walker "needs to be the <u>only</u> lender we [Raleigh Realty] are

recommending;" and any agent who refused to unlawfully induce his or her clients to use CrossCountry was "taking money out of the entire company's pocket" or "<u>my</u> pockets." (*See below* (emphasis added)).



51. Mr. Fitzgerald threatened that, if he were to "see" any Raleigh Realty agents not exclusively referring clients to CrossCountry by, for example, "recommending [an agent's] friend lenders" to their clients, he would retaliate by depriving those agents of future leads. Because real estate agents work exclusively on commission, Mr. Fitzgerald's repeated threats to withhold leads were tantamount to threats to terminate the agents' livelihoods.

52. Agents employed by Raleigh Realty were in fact reprimanded, suspended, and otherwise disciplined by Mr. Fitzgerald when they provided their homebuyer clients with mortgage information from other mortgage brokers.

53. Mr. Fitzgerald's words and conduct enacted a requirement upon Raleigh Realty agents to refer <u>all</u> their homebuyer clients to CrossCountry in order to abide by the agreement with CrossCountry and receive the unlawful kickbacks or referral fees.

54. Mr. Shackelford put similar pressure on Raleigh Realty, telling Mr. Fitzgerald that he should not allow Raleigh Realty agents to use any mortgage company other than Cross Country, whether Corey Walker or different Cross Country personnel.

55. In or around May 2022, Mr. Shackelford noticed a downturn in Raleigh Realty's referrals and complained to Mr. Fitzgerald that Raleigh Realty had been failing to meet a minimum expectation of fifteen deals a month and threatening to cut the amount of the monthly $15,000 payment by roughly half.

56. CrossCountry ultimately terminated its agreement with Raleigh Realty after concluding that the numbers of referrals were insufficient for the $15,000 monthly kickback.

57. As demonstrated by the foregoing, Defendants' agreement was not formed, executed, or operated as a proper co-marketing agreement under the applicable law, including RESPA.

58. From the very beginning, Mr. Shackelford and Mr. Fitzgerald—notwithstanding cover stories and pretenses—plainly circumvented CrossCountry's internal policies that were aimed at ensuring compliance with RESPA, and in doing so enacted an agreement that, in practice, operated as a "pay-for-play" scheme based on referrals in direct violation of RESPA.

**PLAINTIFFS' FACTUAL ALLEGATIONS.**

59.    Here, Plaintiffs bore increased costs for settlements services caused by Defendants' agreement, including but not limited to a higher interest rate, higher closing costs, and higher ongoing payments for the life of the loan.

60.    Had Plaintiffs been able to fully consider their options in the mortgage market, they would have paid less for settlement services. Defendants deprived their clients of the benefits of impartial and fair competition in the mortgage market, which ultimately resulted in clients—including Plaintiffs—paying amounts in excess of what they would have otherwise paid. For Plaintiffs, such deprivation constitutes real harm with adverse effects that will continue for the life of the loan.

61.    Plaintiffs engaged Raleigh Realty in connection with their move from northern Illinois to Wake County, North Carolina. Plaintiffs were clients of Raleigh Realty from June 2021 until their closing on December 17, 2021. Plaintiffs were represented by Mr. Allen Hueter ("Mr. Hueter"), a Raleigh Realty agent who at the time worked for Raleigh Realty exclusively.[6]

62.    Plaintiff John Kessler had a relevant credit score of 727[7] on December 8, 2021, the day he applied to Cross Country Mortgage for a mortgage loan. Based on that score, on the 80% loan-to-value ratio, and on the prevailing market rates on that date, he

---

[6] Mr. Hueter is no longer employed by or associated with Defendant Raleigh Realty.
[7] This score was Mr. Kessler's "middle" score relevant to mortgage lenders. Lenders typically consider an applicant's credit scores as determined by the three major credit-rating bureaus: Equifax, TransUnion, and Experian, discard the highest and lowest of the three, and evaluate the borrower on the middle of the three.

would have been able to obtain a 30-year fixed-rate loan with an interest rate of 2.75% to 3%.

63. Plaintiffs did not know this at the time, because in fall 2021 Mr. Hueter instructed Plaintiffs that CrossCountry was the best and only option for their mortgage and was highly recommended by Raleigh Realty's owner, Mr. Fitzgerald. Plaintiffs complied with these instructions and sought a mortgage from CrossCountry exclusively.

64. The representations about CrossCountry being the only option for their mortgage were made at the explicit direction and instruction of Mr. Fitzgerald in furtherance of the kickback scheme (as described *supra*) and plainly had the tendency to increase unnecessarily the costs for Plaintiffs' settlement services.

65. In late 2021, Plaintiffs made an offer to purchase and entered into a Purchase Agreement for the Property. The sale price was $714,254. The closing date was set for December 17, 2021.

66. CrossCountry originated a 30-year, fixed-rate mortgage for Plaintiff John Kessler as borrower. The amount of the mortgage was $571,404, representing an 80% loan-to-value ratio. The interest rate on this mortgage is 3.25%. This rate was determined on December 8, 2021, and per agreement with CrossCountry was held until December 22, 2021.

67. This rate is considerably higher than the rate for which Plaintiffs would have qualified had Raleigh Realty not steered them to CrossCountry and strongly discouraged them from other options.

68. If Plaintiff John Kessler had borrowed $571,404 at a rate of 3%, instead of 3.25%, the monthly mortgage payment would have been $77.73 lower. The difference over the 360-month life of the loan is $27,982.80.

69. But that difference of 0.25% to 0.5% is not even the whole story. CrossCountry's "starting adjusted base rate" for Plaintiff John Kessler was 3.875%. To obtain the rate of 3.25%, the Kesslers were required to pay a "discount point fee" of $11,473.79. Application of the 3.875% rate would have resulted in tens of thousands of dollars in additional interest payments over the 30-year life of the mortgage.

70. Additionally, Plaintiffs were required to pay a "loan origination fee" of $995 to Defendant CrossCountry Mortgage.

71. If Plaintiffs had had the opportunity to shop around, they would have been able to borrow from a mortgage lender that charged a lower "loan origination fee" or none at all.

72. Plaintiffs would have paid far less in fees and interest if they had had the opportunity to shop around for different mortgages. Having been tied into CrossCountry Mortgage, they had no choice but to pay these additional costs. To be clear, Plaintiffs would not have paid these excessive amounts but for Defendants' unlawful arrangement.

73. Given the high level of trust that Plaintiffs and other consumers place in real estate agents when buying a home, Raleigh Realty compelled Plaintiffs to use CrossCountry despite the disadvantageous interest rate over the life of the loan and the increased settlement costs.

74. The words and actions of Raleigh Realty, its owners, and its agents were intended to have and did have the effect of affirmatively inducing Plaintiffs' selection of CrossCountry as their mortgage lender. regardless of whether CrossCountry would have been the most choice most beneficial to Plaintiffs.

75. The unlawful kickbacks and business referral fees exchanged between Defendants have the tendency to increase – and actually have increased unnecessarily – the costs of settlement services to Plaintiffs, causing real harm with adverse effects including higher interest rates, higher closing costs, and higher costs continuing through the life of the loan.

76. Plaintiffs closed on the Property on December 17, 2021, on terms described above. To secure the mortgage CrossCountry caused a deed of trust to be recorded on that date with the Wake County Register of Deeds, in Book 018847 at pages 020207 – 02038.

## V.  CAUSES OF ACTION.

### FIRST CAUSE OF ACTION
**Violation of Real Estate Settlement Procedures Act ("RESPA"),**
**12 U.S.C. § 2607, *et seq*.**

77. The foregoing allegations are incorporated by reference and realleged herein.

78. Plaintiffs were represented by Raleigh Realty from June 2021 until their closing on December 17, 2021. Their agent was Mr. Hueter.

79. In or around late December 2021, Plaintiffs made an offer to purchase a home located at 106 Sunset Bluffs Drive Fuquay-Varina 27526, Wake County, North

Carolina. The sale price of the home was $714,254. Plaintiffs sought a mortgage to fulfill the Purchase Agreement.

80. By and through its agents, Raleigh Realty insisted that Plaintiffs choose CrossCountry as their mortgage lender, resulting in a higher interest rate and closing costs that Plaintiffs would not have paid but for Defendants' unlawful arrangement.

81. By and through its agents, Raleigh Realty directed, impelled, and affirmatively influenced Plaintiffs' selection of a real estate settlement service provider: Defendant CrossCountry.

82. Defendants executed and enforced an agreement and understanding that Raleigh Realty's agents would exclusively refer their clients to CrossCountry brokers for mortgage origination services in exchange for CrossCountry's payment of thousands of dollars per month.

83. From CrossCountry's perspective, the benefit of this arrangement was a stable and regular supply of persons currently in need of a residential loan to purchase a home. From Raleigh Realty's perspective, the benefit of this arrangement was a steady stream of monetary compensation. However, these "benefits" were to CrossCountry and Raleigh Realty alone.

84. Through an unlawful kickback and business referral arrangement with Raleigh Realty (and any other realtors), CrossCountry unfairly competed with other mortgage companies that complied with federal laws prohibiting kickbacks.

85. Moreover, such unfair competition directly and concretely injures consumers, including Plaintiffs, because it tends to increase settlement costs, and actually *has* increased settlement costs for Plaintiffs and others.

86. As a direct result of being unlawfully deprived of any meaningful choice in selecting their own mortgage lender, Plaintiffs have been injured. As a result, Plaintiffs will continuously be made to overpay thousands of dollars in interest alone over the life of their mortgage, as well as increased settlement costs.

87. The arrangement and payments were intentional, unlawful, and expressly violate RESPA.

88. Plaintiffs have standing to sue pursuant to RESPA, 12 U.S.C. § 2607 (d)(2), because they have been injured by Defendants' arrangement and agreement consisting of illegal referral payments and kickbacks related to real estate settlement services involving a federally related mortgage loan.

89. Defendants are jointly and severally liable to Plaintiffs and in an amount equal to three times the amount of any charge for settlement services paid by them, together with the costs of this action and reasonable attorney fees.

## SECOND CAUSE OF ACTION
### Violation of the Unfair or Deceptive Trade Practices Act
### N.C.G.S. § 75-1.1, *et seq.*

90. The foregoing allegations are incorporated by reference and realleged herein.

91. The actions and conduct of Defendants CrossCountry and Raleigh Realty, delineated above, constitute unfair or deceptive acts or practices in or affecting commerce in violation of the UDTPA.

92. Defendants' actions, pattern of conduct, practices, and willful disregard of applicable North Carolina law and the well-being of consumers, including Plaintiffs, constitute unfair and/or deceptive acts or practices in violation of the UDTPA.

93. CrossCountry violated the UDTPA by employing unfair, coercive, false, deceptive, and misleading practices, actions, and representations in connection with providing settlement services and mortgage loans to Raleigh Realty homebuyer clients pursuant to the unlawful agreement between Defendants.

94. Plaintiffs' claims for unfair and deceptive trade practices against CrossCountry include but are not limited to:

   a. Undertaking actions which CrossCountry knew, or should have known, offend well-established public policy, federal and state law, and federal and state banking law and were otherwise unlawful, unfair, deceptive, misleading, coercive, and substantially injurious to consumers, including Plaintiffs;

   b. Employing unfair and deceptive measures to collect or attempt to collect amounts, fees, and other expenses relating to providing settlement services and mortgage loans to consumers, including Plaintiffs;

   c. Employing a system, policies, and procedures for procuring clients, providing mortgage lending services, and providing settlement services to Plaintiffs and other consumers which, under North Carolina law, are unfair, deceptive, and misleading, and not permitted by public policy;

   d. Employing and otherwise undertaking the aforementioned procedures, policies, actions, and methods, with the explicit knowledge that such conduct was in violation of applicable North Carolina law, including the SAFE Act;

e.  Executing and implementing an unlawful agreement with Raleigh Realty to institute unfair, coercive, false, deceptive, and misleading practices, actions, and representations in connection with providing settlement services and mortgage loans to consumers, including Plaintiffs, to their detriment;

f.  Remitting kickback payments to Raleigh Realty in exchange for unfair, coercive, false, deceptive, and misleading practices, actions, and representations in connection with providing real estate agency and brokerage services;

g.  Knowingly enabling Raleigh Realty's unfair, coercive, false, deceptive, and misleading practices, actions, and representations in connection with providing real estate agency and brokerage services Raleigh Realty's clients, including Plaintiffs;

h.  Knowingly enabling Raleigh Realty's violations of RESPA and corollary North Carolina laws and regulations designed to protect North Carolina consumers, including Plaintiffs; and

i.  Proximately causing economic injuries to Plaintiffs.

95. Upon information and belief, all CrossCountry's unfair and deceptive conduct, representations, and omissions alleged herein are pursuant to policies, practices, and procedures created, adopted, and implemented for all of its business with Raleigh Realty.

96. Raleigh Realty violated the UDTPA by employing unfair, coercive, false, deceptive, and misleading practices, actions, and representations in connection with providing real estate agency and brokerage services to its homebuyer clients pursuant to the unlawful agreement between Defendants.

97. Plaintiffs' claims for unfair and deceptive trade practices against Raleigh Realty include but are not limited to:

   a. Undertaking actions which Raleigh Realty knew or should have known to offend well-established public policy, federal and state law, and federal and state banking law and were otherwise unlawful, unfair, deceptive, misleading, coercive, and substantially injurious to consumers such as Plaintiffs;

   b. Employing unfair and deceptive measures to collect or attempt to collect amounts, fees, and other expenses relating to providing real estate agency and brokerage services to consumers, including Plaintiffs;

   c. Employing a system, policies, and procedures for assisting homebuyer clients in securing financing for purchasing a home, procuring mortgage services for clients, and providing settlement services to Plaintiffs and other consumers which, under North Carolina law, are unfair, deceptive, and misleading, and not permitted by public policy;

   d. Employing and otherwise undertaking the aforementioned procedures, policies, actions, and methods, with the explicit knowledge that such conduct was in violation of applicable North Carolina law, including 21 NCAC 58A .0109(i);

   e. Executing and implementing an unlawful agreement with CrossCountry to institute unfair, coercive, false, deceptive, and misleading practices, actions, and representations in connection with providing real estate agency and brokerage services to consumers, including Plaintiffs, in order to ensure they would acquire a mortgage loan from CrossCountry to their detriment;

**f.** Accepting kickback payments from CrossCountry in exchange for unfair, coercive, false, deceptive, and misleading practices, actions, and representations in connection with providing real estate agency and brokerage services;

**g.** Knowingly enabling CrossCountry's unfair, coercive, false, deceptive, and misleading practices, actions, and representations in connection with providing settlement services and mortgage loans to Raleigh Realty's clients, including Plaintiffs;

**h.** Knowingly enabling CrossCountry's violations of RESPA and corollary North Carolina laws and regulations designed to protect North Carolina consumers, including Plaintiffs; and

**i.** Proximately causing economic injuries to Plaintiffs.

98. Upon information and belief, all Raleigh Realty's unfair and deceptive conduct, representations, and omissions alleged herein are pursuant to policies, practices, and procedures created, adopted, and implemented for all of its business with CrossCountry.

99. The forgoing allegations constitute Defendants' unfair or deceptive acts or practices in or affecting commerce in violation of N.C.G.S. § 75-1.1.

100. Defendants' unfair and deceptive acts and practices directly and proximately caused Plaintiffs injury in the form of anxiety, stress, anger, frustration, mental anguish, and other pecuniary losses, expenses, costs, and other such damages to be proven at trial.

101. As a direct and proximate result of Defendants' unfair and deceptive acts and practices, Plaintiffs are entitled to recover all pecuniary losses, expenses, costs, and

damages, including but not limited to the attorneys' fees and expenses incurred in the prosecution of this matter, and other such damages to be proven at trial.

102. As a direct and proximate result of Defendants' unfair and deceptive acts and practices, Plaintiffs are entitled to recover treble damages under N.C.G.S. § 75-16, and reasonable attorneys' fees and costs as provided in N.C.G.S. § 75-16.1.

### THIRD CAUSE OF ACTION
### Civil Conspiracy.

103. The foregoing allegations are incorporated by reference and realleged herein.

104. The actions and conduct of Defendants CrossCountry and Raleigh Realty, as described *supra*, constitute a civil conspiracy.

105. Generally, a claim for civil conspiracy merely "associate[s] the defendants together for liability purposes. *Henry v. Deen*, 310 S.E.2d 326, 334 (N.C. 1984). "The liability of the conspirators is joint and several[:]" each party who enters "into a common purpose or design is equally deemed in law a party to every act…done by any of the others in furtherance of such common design." *Muse v. Morrison*, 66 S.E.2d 783, 785 (N.C. 1951) (cleaned up).

106. To sufficiently state a claim for civil conspiracy, Plaintiffs must allege "(1) a conspiracy, (2) wrongful acts done by certain of the alleged conspirators in furtherance of that conspiracy, and (3) injury as a result of that conspiracy." *State ex rel. Cooper v. Ridgeway Brands Mfg., LLC*, 666 S.E.2d 107, 116 (N.C. 2008) (citing *Muse* at 785).

107. Upon information and belief, Defendants intended to form and did form a conspiracy by entering into an unlawful agreement by which Raleigh Realty exclusively referred its buyer clients, including Plaintiffs, to CrossCountry in exchange for a monthly monetary payment.

108. Upon information and belief, Defendants shared an express understanding to implement this agreement by purposefully and actively depriving consumers, including Plaintiffs, of their right to participate in the mortgage lending process without the cost-increasing kickbacks and referral fees explicitly prohibited by RESPA.

109. Upon information and belief, Defendants shared an express understanding to implement this agreement to institute policies and practices to unfairly and deceptively induce consumers, including Plaintiffs, to select a mortgage against their best interest in violation of the UDTPA.

110. Each Defendant repeatedly violated RESPA and corollary state laws and regulations in furtherance of the conspiracy, and as a result, Plaintiffs suffered damages as identified herein.

## VI.    PRAYER FOR RELIEF.

WHEREFORE, Plaintiffs pray for the following relief:

a. Adjudging that Defendants CrossCountry Mortgage, LLC, and Raleigh Realty, Inc., each violated RESPA, 12 U.S.C. § 2607;

b. Awarding Plaintiffs all damages permitted by RESPA, including treble and statutory damages where applicable;

**c.** Trebling the compensatory damages of Plaintiffs pursuant to N.C.G.S. § 75-1.1, *et seq.*;

**d.** Adjudging that Defendants violated the UDTPA;

**e.** Awarding Plaintiffs attorneys' fees;

**f.** That the costs of this action be taxed to Defendants;

**g.** For a trial by jury on all issues so triable; and

**h.** For such other and further relief as the Court deems just and proper.

Respectfully submitted, this the 25th day of June, 2025.

**MAGINNIS HOWARD**

*/s/ Edward H. Maginnis*
EDWARD H. MAGINNIS
N.C. State Bar No. 39317
CHRISTOPHER R. BAGLEY
N.C. State Bar No. 50567
7706 Six Forks Road, Suite 101
Raleigh, North Carolina 27615
Tel:   919-526-0450
Fax:   919-882-8763
emaginnis@carolinalaw.com
cbagley@carolinalaw.com

*Counsel for Plaintiffs*